Filed March 6, 1894.

———————◆———————

No. 16,656.

ADAMS ET AL. *v.* CURTIS ET AL.

FRAUDULENT CONVEYANCE.—*Husband and Wife.*—*Sufficiency of Evidence.*—*Supreme Court Practice.*—Where a wife furnished her husband with money with which to purchase real estate, and the husband purchased land, taking the deeds in his own name, of which the wife had knowledge, and which she acquiesced in until the husband had embarked in the mercantile business and had created indebtedness on the faith of his ownership of the lands under such deeds, then afterwards, by a secret conveyance made May 22, 1888, the husband and wife conveyed the same to S., without consideration, who on the following day conveyed the same to the wife,

which latter deeds were not recorded until October 24th, 1888, the appellate tribunal will not disturb a judgment setting aside such conveyance as fraudulent.

From the White Circuit Court.

*T. F. Palmer* and *C. C. Spencer*, for appellants.

DAILEY, J.—On the 6th day of November, 1891, the appellees brought an action against the appellants in the White Circuit Court for the purpose of setting aside an alleged conveyance of about one hundred and twenty acres of real estate, made by the appellant, John H. Adams, indirectly through Samuel D. Sluyter, to his wife, the appellant, Rebecca E. Adams, as fraudulent and void as to the appellees, who were creditors of the appellants John H. and John A. Adams, and for the expressed purpose of making said real estate liable for the payment of several judgments held severally by the appellees against the appellants John H. and John A. Adams.

The complaint is in one paragraph. Appellants filed separate demurrers to the complaint for want of sufficient facts and misjoinder of plaintiffs, which were overruled and exceptions taken. Appellants, each for him or herself, then filed a separate answer of general denial to the complaint. The cause was tried by the court and a finding rendered for the appellees, that the allegations of the complaint are true; that the deeds executed by which the lands described in the complaint were conveyed to the appellant, Rebecca E. Adams, be set aside as fraudulent and void; and that the land be held liable for the payment of appellees' several judgments mentioned in the complaint. Appellants then moved and filed causes for a new trial, and appellant, Rebecca E. Adams, separately moved and filed causes for a new trial, which motions were overruled and exceptions taken, and appel-

Adams *et al. v.* Curtis *et al.*

lants and appellant, Rebecca E. Adams, separately, then moved the court in arrest of judgment, which motions were overruled and exceptions taken.  Afterward the court rendered judgment in accordance with the finding, from which the appellants and appellant, Rebecca E. Adams, separately, seek relief in this court.  Appellants together, and Rebecca E. Adams separately, assign error in which the complaint and finding of the court are attacked, and they rely upon the assignments, alleging error of the court in overruling the several and separate motions for a new trial, and in overruling the several and separate motions in arrest of judgment.

Appellants' entire argument is in support of the contention that the evidence does not tend to sustain the finding of the court.  They rely chiefly upon the testimony of the appellant, Rebecca E. Adams, as to the material facts in the case.  From her statement it appears that she and John H. Adams intermarried in 1857, and have lived together as husband and wife ever since that time; that the husband then possessed no property except a lot in Reynolds, and has accumulated little since beyond a living for the family; that her father, Mr. Bunnell, was a man of means, and after the marriage set them up in housekeeping; also gave them poultry, pigs, a horse and cow and money from time to time, which accumulated until 1867, when the gifts and increase were sold, and they moved to the State of Missouri, where they bought lands at intervals which were taken and held in their joint names; that her father, then living in Indiana, was called upon, and on several occasions took to and sent her money, with which the balance of the purchase-money on the land and the mortgages on the same were paid.  As the exigency of their affairs required, portions of the land were sold to

obtain money to support the family and pay expenses of sickness. After the death of Mrs. Adams' father, the money so advanced was taken out of her share of his estate, she receiving but fifty-seven acres, while her brothers and sisters each received about two hundred acres. At the end of a twelve or thirteen years' residence in Missouri they sold the residue of their land in that State, consisting of eighty acres, and with $1,800 of the sum realized, in her control, they returned to White county, Indiana, where they have ever since lived. She further says that before their return they had a settlement, in which the $1,800 became her own; that this amount was increased to some extent by money she inherited from her mother's estate in Ohio; that she kept the money in her trunk for a time, and then having an opportunity to purchase some land, she instructed her husband to buy it for her and she paid for it; that two other tracts were obtained in the same way, the three being the real estate described in the complaint; that the husband acted for her in the matter, and she, upon being informed that he had taken the deeds in his own name, remonstrated, and at times repeated her remonstrance, and he as often promised to have it put in her own name; that she never authorized him to take the title in his name, and he had nothing invested in it; that she did not know that her husband was embarrassed and could not pay his debts on the 22d and 23d days of May, 1888, when the transfer was made, or that he intended to perpetrate a fraud upon his creditors, and knew nothing of her husband's business troubles until the store was shut up by attachment proceedings brought by the appellees in February, 1890; and that she opposed the purchase of the stock of goods when the transaction took place.

This testimony was before the court for its approval,

and, if believed, it constituted a complete defense to the action, and clearly established her right to the real estate in controversy, freed from the demands of the husband's creditors.

It is the law that a mortgage or deed given by a husband to his wife to secure or pay a *bona fide* debt due her from him, will be upheld, although at the time of its execution she may have known that he was indebted to other parties, and that suits were pending to enforce the collection of such claims; that a preference may be given to any lawful demand against the debtor, whether due or not, and whether held by his brother, his wife, or his attorney, or any other person.   *Dice* v. *Irvin,* 110 Ind. 561; *Cornell* v. *Gibson,* 114 Ind. 144; *Brigham* v. *Hubbard,* 115 Ind. 474; *Brookville Nat'l Bank* v. *Kimble,* 76 Ind. 195.

But the testimony in this case is not wholly limited or confined to Rebecca E. Adams' version of the facts.    It appears from the record, that in April, 1888, John H. Adams and John A. Adams, his son, purchased a stock of goods from John M. Bailey, and gave him their notes therefor.    These notes were assigned by the payee to certain of the plaintiffs, and the remainder of the indebtedness to the plaintiffs, upon which the judgments were taken, and by virtue of which the plaintiffs seek to set aside said conveyances to Rebecca E. Adams, were incurred by John H. Adams and John A. Adams for goods sold to them prior to October 24, 1888, but, as to most of the plaintiffs, after the execution of the deeds.

There is the testimony of Lazarus Hirsch, that in May, 1888, he went to see John H. Adams concerning the notes his firm held against him, when Mr. Adams said, in substance: "Look here, Mr. Hirsch, right across here, beyond the little town here, I have a hundred and twenty acres of land in my own name, and if this store should

burn down tomorrow I am able to pay every dollar I owe." And, upon that statement, the witness continued to sell him goods.

Samuel C. Curtis testified to substantially such a conversation with John H. Adams, and about the same time as the one by Adams with Hirsch.

These representations were probably made after the deeds to the wife were executed, but she was not present when they occurred.

It is evident that John H. Adams practiced a deception upon the appellees, in order to induce them to extend his credit and to part with their goods, and that he accomplished the end desired.

It yet remains for us to consider whether other facts are sufficiently shown, and whether these facts are *prima facie* adequate proof that Rebecca E. Adams united with him to effect the fraudulent design, or are such as to fairly create an inference that she combined with him to effect such purpose.

In either event, we could not disturb the finding and judgment of the trial court.

It will be recalled, without regard to the source of the consideration paid for the Missouri lands, that John H. Adams and Rebecca E. Adams were, by mutual understanding, tenants by entireties therein, and so remained during the entire ownership thereof. She says they had $1,800 when they came from Missouri, in October, nine years before, which she kept in the house in a trunk. This was the residue of the sum realized from their property after the payment of debts. It was invested in the real estate in litigation after their return to Indiana, in 1883, 1884 and 1885.

Two forty-acre tracts were bought of Joseph Thompson, and one forty from Mrs. Virden; and a tract was also bought from "The Little Sisters of the Poor," in the

names of both. Ten dollars per acre was paid Thompson for the first forty bought of him, and about $200 was paid on the second tract, which was bought at the same price, and a mortgage was given for the balance of the purchase-money. Seven dollars per acre, in cash, was paid Mrs. Virden for the forty acres obtained of her, the deed to which was made to her husband. They got the last forty from Thompson before they bought of the "Sisters." She gave her husband the balance of the $1,800 to make improvements, but does not know how much was spent for them. She can not state what they paid for the Missouri land, but thinks between $500 and $600.

It is clear that the wife knew, at the time, of the several purchases of the Indiana lands, just how the title was taken; that she was a tenant by entireties with the husband in the premises conveyed by the "Sisters," and in all the other deeds he was the grantee.

The lack of uniformity in naming the purchaser would indicate, in the absence of countervailing circumstances, that the method adopted by the scrivener was prearranged by the parties and agreeable to all the persons concerned. This inference is strengthened by the fact that the title so acquired was acquiesced in by Rebecca E. Adams, until the husband had embarked in mercantile business and contracted debts on the faith of his ownership of the lands under such deeds, and in the following month thereafter was the recipient of a secret deed for the entire premises, through the intervention of a trustee, which was withheld from the records of the county until October 24, 1888, more than five months after its execution, leaving the husband, in the meantime, to contract debts on his apparent claim of ownership and title, without the ability to pay any part of them.

Indeed, it is an incontestable fact that with the title to the real estate in controversy vested in Mrs. Adams, the debtors, both father and son, were left in a state of hopeless insolvency.

It is true that in explanation of her omission to have these muniments of title entered of record, Rebecca says she received the deeds when they were executed, and placed and kept them in her trunk; that she requested the husband, at different times, to have them recorded, but he, being postmaster and confined to his office, neglected it until October 24, 1888, when, at her repeated request, she procured the work to be done.

It is a coincidence, however, that the recording did not take place until the debts were all contracted and the credit of the firm was exhausted. Besides this, peculiar means were adopted to accomplish the result. The husband and wife conveyed this real estate to Samuel D. Sluyter on May 22, 1888. It seems to give the transaction the semblance of deliberation; they waited until the next day, when Sluyter conveyed the premises to Martha E. Adams, whom he never saw during the management of the affair. In the enactment of this apparent farce, the husband informed Sluyter that the conveyance would not be lawful without a consideration, and, to impart to it the color of validity, he resorted to the fiction of giving him $100, which was returned after the deed was made.

The record also discloses that on January 25, 1884, Rebecca E. Adams joined her husband in the execution of a mortgage on a part of the land, to Joseph G. Thompson, to secure a part of the purchase-money due from John H. Adams, the grantee.

In addition to all this, on September 26, 1884, John H. Adams and Rebecca E. Adams, his wife, executed a mortgage, on the land in question, to secure the pay-

ment of $350, money borrowed by the husband from the Union Central Life Insurance Company, of Cincinnati, Ohio. In this mortgage the following sentence appears: "And the mortgagors represent to the mortgagee, that the title to said real estate is a good and indefeasible estate of inheritance in fee simple in the mortgagor, John H. Adams; that he is now in possession of said real estate, and that there are no liens or incumbrances thereon prior or superior to this mortgage."

In view of all the facts and circumstances appearing in the evidence, we think it was a matter fairly within the province of the trial court to say whether the transfer of this property was in discharge of a preëxisting obligation honestly claimed, or the result of a crafty scheme to place it beyond the reach of *bona fide* creditors. This court will not reverse the action of the lower court, where there is evidence which tends to support its finding and judgment, and "circumstantial evidence is, in most cases, the only proof that can be adduced." 2 Rice Ev., 970, and cases cited.

The disclosure of fraudulent intent is seldom a matter of proof by direct and positive evidence. To require conclusive proof would result in a practical frustration of justice and render all attempts as to its disclosure abortive; the law is satisfied, therefore, with a reasonable degree of certainty. *Stanfield* v. *Stiltz*, 93 Ind. 249; *Brower* v. *Goodyer*, 88 Ind. 572.

The quantum of evidence necessary to establish a fraudulent transfer is not a matter of exact legal definition. Evidence which will satisfy a man of sound judgment and fair discernment is usually regarded as sufficient.

In Rice on Ev., vol. 2, pages 954 and 955, section 369, it is laid down as a rule that the entire tenor of judicial investigation, wherever fraudulent transfers are

involved, indicates the pertinency of any evidence calculated to disclose, among other things: 4. Allegations of antecedent indebtedness, from husband and wife, father and son. 6. Failure to record the deed.

It is further said on the latter page: ''Proof of any or all of the above tabulated circumstances is competent, and some satisfactory explanation from the parties should be required.'' Also: ''It may be further observed that slight proof is necessary to establish proof of fraudulent intent between parties who occupy confidential relations.''

In the same book, on page 956, the author quotes: ''When a grantor executes a deed with intent to defraud his creditors, the grantee can only protect his title by showing that he is a purchaser for a valuable consideration and without notice of the fraudulent intent on the part of his grantor.''

And in *Callan* v. *Statham*, 23 How. 477, it is said: ''As they aver, the payment was a transaction between themselves, and the principal part of a note was held by the vendee, which he surrendered, the evidence in respect to which is therefore exclusively within their own knowledge; it would have been more satisfactory if they had given some proof in support of the answers, especially when there were other accompanying circumstances tending to excite distrust and suspicion as to the *bona fides* of the deed.''

In 2 Thompson on Trials, section 2016, it is said: ''Another badge of fraud consists in the transfer, by a debtor in failing circumstances, of all or most of his property, to his *near relatives*. But such a transfer can not be pronounced fraudulent as matter of law; whether it is so or not, is a question of fact for the jury.''

''Thus, it has been held that the transfer by a son in failing circumstances, of his personal property to his

father, may excite suspicion of fraud, but is not fraudulent *per se*, and whether fraudulent or not, is to be determined by the jury." *Forsyth* v. *Matthews*, 14 Pa. St. 100; *State, ex rel.*, v. *True*, 20 Mo. App. 176 (181).

We think the court below reached its conclusion through the usual avenues that facilitate the detection of fraud, and we will not disturb its judgment.

The judgment is affirmed.

Filed Mar. 29, 1894.