## CHATTEL MORTGAGES WITHHELD FROM RECORD.

Circuit Court of Cuyahoga County.

THE GIBSON & PRICE COMPANY v. THE ROUSE & HILLS
COMPANY ET AL.

Decided, January 26, 1903.

*Fraud—When Withholding Chattel Mortgages from Record Not a Fraud
Upon Creditors.*

Where chattel mortgages, covering all the property and all the ac-
counts and bills receivable of the mortgagor, are taken as temporary
security and are withheld from record, not as the result of any
agreement nor with fraudulent intent, nor for the purpose of secur-
ing credit for the mortgagor from other parties, but to prevent
creditors already existing from all pressing demands for payment
at once, such mortgage is not a fraud upon present prospective
creditors.

*White, Johnson, McCaslin & Cannon,* for plaintiff.
*Blandin, Rice & Ginn* and *Cline, Carr, Tolles & Goff,* contra.

CALDWELL, J.; HALE, J., and MARVIN, J., concur.

This case is in this court on appeal from the Common Pleas
Court of Cuyahoga County. The facts in the case need not be
stated in full, except so far as may be required in the considera-
tion of the questions of law involved in the case.

The defendant, the Rouse & Hills Company, was in business
in the city of Cleveland, and B. L. Rouse was the president of
the company and representing the company in most of the trans-
actions involved in this action.

B. L. Rouse, while the active man in the Rouse & Hills Company
during the course of the events narrated in the evidence in this
case, also had a business of his own, which he conducted as B.
L. Rouse & Company. *His* business was largely the manufactur-
ing of goods in the same line as the goods that the Rouse & Hills
Company handled and *his* goods were sold directly to the Rouse
& Hills Company. The Rouse & Hills Company were debtors
to the bank and were also debtors to H. C. Rouse. B. L. Rouse,

in his individual business, owed $3,000 in debts. The Rouse & Hills Company was also indebted to B. L. Rouse in quite a considerable sum of money, but, as he was connected with both companies, this indebtedness to him seems to have been treated in this case, upon his authority, as *not* a liability of the company.

The B. L. Rouse Company, through its president, B. L. Rouse, applied to the bank for a further credit, and the bank, upon making an inquiry as to the financial condition of the company, was told by B. L. Rouse that it was indebted to H. C. Rouse upon two notes: one for $5,000 and the other for $12,000, and that it had given to him demand *cognovit* notes for the same. Thereupon the bank refused any further credit to the corporation unless the H. C. Rouse *cognovit* notes should be gotten out of the way, and the bank referred the matter to its attorney, Mr. Goff, to determine what could be done in that line. Mr. Goff found that H. C. Rouse was out of the city, in Europe or Africa, and that the firm of Hoyt, Dustin & Kelley were his lawyers, and Mr. Goff thereupon applied to Mr. Dustin in regard to the matter and, after considerable discussion, it was agreed between them that the *cognovit* notes of H. C. Rouse should be merged, but not surrendered, and that he should have a collateral note for the amount of the same, and that the bank, for the amount that the company then owed it and for an additional credit of some $15,000, was to have a note, and these notes were to be secured by chattel mortgages; one to H. C. Rouse for the amount due him, and the other to the bank for the amount that the company then owed it and the additional credit to be given it.

This was not done without several conferences with B. L. Rouse, the president of the company, and Mr. Smith, who was secretary of the company, and these creditors required statements of the financial condition of the Rouse & Hills Company to be made to them and the officers of the company were examined and questioned carefully as to all the assets shown by the statements and to its mode of doing business and as to whether it was making or losing money in carrying on its business. After a full and exhaustive examination along these lines, Mr. Hoyt and Mr. Dustin became satisfied that the company was solvent and was in a fair way of making money, and that Mr.

B. L. Rouse assured them that when H. C. Rouse returned he would furnish all the money necessary to the Rouse & Hills Company to enable it to pay off the bank, and relieve it entirely from any debts that might be pressing; but the Rouse & Hills Company was just at that time in need of some $15,000 to take up liabilities that it then owed and which it desired very much to take care of at that time, and Mr. Dustin, being satisfied of the financial soundness of the company and believing what Mr. B. L. Rouse said as to the aid that H. C. Rouse would give it upon his return, he (Dustin) took the responsibility of not entering up judgments on these notes and taking a new collateral note to the *cognovit* notes held by H. C. Rouse, and which were in his possession, and took the chattel mortgage until such time as H. C. Rouse should return to the city of Cleveland.

The securities then taken by way of chattel mortgages and assignments, covered the bills receivable, the accounts and the goods of the Rouse & Hills Company, and also covered all acquisitions that might thereafter come into these lines of credit.

Thus far, it is insisted, that the evidence shows that when these chattel mortgages were given covering substantially all the property of the Rouse & Hills Company within its possession or that might thereafter come into its possession in the carrying on of its business, the Rouse & Hills Company was insolvent, and that the bank, as represented by the officers of the bank and its attorney and the attorney of H. C. Rouse, knew that the company was insolvent and unable to pay its debts. The evidence shows that the Rouse & Hills Company was at that time carrying on its business in the usual way and was meeting its financial responsibility with ordinary promptness, and that it was insolvent was *not* made out to the plaintiff in this case except as the expert bookkeeper sees fit, as a matter of bookkeeping, to throw out certain assets and liabilities to the company and reduce the assets of the company by diminishing values. We conclude that the company was *not* at that time insolvent, and that the attorneys who represented the creditors obtaining the chattel mortgages and assignments had no knowledge of the insolvency of the company nor did they have such evidence before them as would warrant a careful man in be-

lieving that the company was insolvent; and that these chattel mortgages were not taken with any intent to hinder, delay or defraud creditors.

These chattel mortgages were supposed to be temporary securities. Relying upon the confidence of B. L. Rouse that H. C. Rouse would aid the company upon his return to the city, it was supposed by all parties that he would do so upon his return and that then matters would be straightened up and everything put into a more permanent form. These chattel mortgages were not filed of record as required by the state of Ohio, Section 4150 of the Revised Statutes, but were held, one by A. C. Dustin, and the other by Mr. Goff—the two creditors to whom they had been given. While these mortgages were thus withheld from the record, the Rouse & Hills Company went on with its business in the ordinary way, buying goods as theretofore and carrying on its business in the usual manner. The money obtained from the bank was used in paying liabilities of the company, and, for aught that appears in this case, the mortgagees knew nothing of how business was carried on by the company, until some little time after the mortgages were taken, when they required that monthly statements of all the business being done by the company should be made to them; these were made, and trial balances also furnished. There was nothing in any of these statements that would indicate to the creditors that the company was not getting along well with its business. After these mortgages had been held for several months without being left for record, Mr. Hills of the company came to the city, he having been out of the city during these transactions, connected with business in the east, and was in consultation with attorneys in the city, and the attorneys representing the chattel mortgages became aware of his presence and, owing to some difficulty between him and Mr. B. L. Rouse of which they had learned, they became suspicious that he intended to do something that might, in some way, be injurious to their securities and, thereupon, by an understanding between them, they took possession of the property secured by their mortgages. Thereafter the Rouse & Hills Company made an assignment to Mr. Ginn and he is in this case representing the creditors generally, while other credi-

tors are being represented by attorneys who make a claim some-what different from that of the trustee.

It is claimed by the trustee, that these chattel mortgages are void as to all the creditors, while some of the creditors are here claiming that the chattel mortgages are void only as to those credits given before the time of the giving of the chattel mort-gages and the time of taking possession under the same.

These facts raise a number of questions in the case:

1st.   Are these mortgages invalid as to creditors because the corporation was insolvent when they were given?

As before stated, we think the company was *not* insolvent when the mortgages were given, and we have also said that they were not given to hinder, delay and defraud creditors; and the bank and H. C. Rouse, notwithstanding their mortgages covered all goods purchased by the company and all accounts due to it after the giving of the mortgages, took assignments of accounts as late as on the 29th of the month and not long prior to the time of taking possession under these mortgages; and it may be con-tended that these mortgages are, therefore, void because of the proximity of the time when the company went into the hands of the trustee.   The last claim is that the mortgages are not valid because withheld from record.

This last question is the only one  that remains for considera-tion in this case; and it is determined, first, by the evidence, and second, by a consideration of the law.

The claim made is, that these mortgages were withheld either by agreement between the mortgagor and the mortgagees, to enable the mortgagor to obtain credit in his business, or, if not by such an agreement or understanding to that effect, yet that, under all the circumstances and facts surrounding the transac-tion, they had the effect to so mislead persons to give credit to the company in the interim of the withholding, that an estoppel will arise in favor of the creditors who, in this interim, extended credit, and will make the mortgage void as to them.

The most favorable evidence in the case is, that there seems to have been an understanding between the attorneys representing the mortgagees, that neither would do anything under his mort-gage without giving the other notice.   There was no agreement

between the mortgagor and the mortgagees as to the withholding of the mortgage from record. The testimony of Mr. Goff bears upon this question somewhat. This question was asked him.

"He said to you that with the help of the money which was advanced, and the payments which he could make and the indulgences and extensions which he could get from merchandise creditors, he would pull through, did he?" Answer. "Who said that?"

Question. "B. L. Rouse." Answer. "No, I don't think he put it in that way; he said that he would have no difficulty with Mr. Henry Rouse, who held $17,000 of the notes of the Rouse & Hills Company; that with the $15,000 of additional money that he was to borrow at the bank, he would pay off something like $15,000 or $18,000 of bills payable, at maturity; that his sales would enable him to take care of his accounts payable as they matured, with such extensions as he could get by the giving of notes."

Question. "You testified before: 'I recall the $18,000 item and that he wanted about $15,000 to take care of these items, stating that if that were provided, he would have no difficulty out of his sales to take care of the accounts payable, with such indulgence as he could get in that way?'" Answer. "That is what I now say."

Question: "Then the fact that he would still require extensions from merchandise creditors was talked of at that time when this loan was under consideration?" Answer. "I don't think that question of asking for indulgence or extensions in that way was discussed; it was the right that he had as a dealer, as a purchaser from the jobber or manufacturer, or whatever it was, to his cash discount if he saw fit to pay cash, or the giving of a four months paper, perhaps if he did not care to pay cash; it was simply a right that he had."

Question "Did you use the expression 'such indulgence as he could get?'" Answer. "Well, such indulgence as was given him or he had a right to by giving paper."

Question. "Indulgence is not a right, is it?" Answer. "Possibly not, strictly speaking."

Question. "Did you learn from him then that he was asking extensions of merchandise debts that had become due?" Answer. "No, sir, I did not."

Question. "And that he has been for some time trying to obtain extensions?" Answer. "No, sir, I did not."

Question. "Did you make any inquiry on that subject?" Answer. "I think not."

Question. "You contemplated that he should continue in business as he had before?" Answer. "No, sir, not as he had before; I assumed that he would continue business and that there would be no necessity for any considerable purchase of merchandise until Mr. Rouse's return."

Question. "I do not know what considerable means; you contemplated that he would make purchases?" Answer. "To a very limited extent, I think."

Question. "You took no action to limit purchases, did you?" Answer. "Yes, I think Mr. Wilson was quite particular to emphasize that matter."

This evidence to our mind shows that until Mr. Rouse returned, it was supposed by the mortgagees that the Rouse & Hills Company were carrying on business, but that, owing to the state of its stock on hand, it would have no occasion until Mr. H. C. Rouse's return, to obtain credit to any considerable extent. Mr. Rouse did not return as soon as he was expected and the period of holding these chattel mortgages was for that reason extended beyond what was contemplated when they were given and this led to more extensive purchases by the company than was contemplated by the mortgagees when they received their security. Then bearing upon the question of filing these mortgages, this question was asked of Mr. Goff:

"Now, Mr. Goff, did you not in your experience of such matters, know that if you and he filed this mortgage covering all property then or thereafter existing, of the Rouse & Hills Company, or made its existence known, and the existence of the assignment of the accounts, that that would end the transaction of business by that company in its capacity to get credit?" Answer. "I think I knew if the mortgage was filed, that that would bring about a closing-down of the business. I think that would necessarily follow."

Question. "And all the accounts, present and future, had been assigned, and yet you say that nothing was said there by you or Mr. Dustin or Mr. Wilson or Mr. B. L. Rouse or Mr. Smith on the subject of the effect of making known this mortgage, do you?" Answer. "I recall nothing that was said; it was certainly understood between us, that until Mr. Rouse returned, which was expected in the latter part of March, that in

order to accomplish what was desired so as to keep that a going concern until Mr. Rouse's return to the city, that there should not be publicity given.''

This is the only testimony that I find in the case, that hints very closely upon any arrangement between the mortgagor and the mortgagees to withhold these mortgages from record, and it is the only thing from which the purpose and intent of the withholding of the mortgages might be inferred to extend to the credit of the company. He distinctly states that he remembers nothing that was said on the question of withholding but he says that it was understood by Rouse and Smith representing the mortgagees that, in order to accomplish what was desired, they would give no publicity until the return of Mr. H. C. Rouse.

To our minds the evidence shows in addition to what I have already said: That this arrangement of giving the mortgages on account of the confidence that B. L. Rouse had that H. C. Rouse would give the company all the financial aid it needed upon his return, that these mortgages were given, as, in a measure tentative in their character, to hold the matters of the company in its then condition or as they would be after using the money got by the loan until the return of Mr. H. C. Rouse. There was no purpose in withholding the mortgages to injure any creditors that might in the interim sell goods to the company, or renew obligations: nor was there any agreement to withhold the mortgages from record. The only purpose in withholding them was, not to extend the credit of the company, but to prevent creditors, already existing, from so pressing the company that it would be obliged to meet its obligations, not in the ordinary course of business, but by all bringing pressure at once upon it, and this is what we understand this testimony to mean.

And we find from the facts, that the mortgages were not withheld from record with any fraudulent intent or purpose, nor was it *supposed* or *believed* by the mortgagees that withholding from record would be the means of extending the credit of the company, for their belief was that until Mr. Rouse returned,

there would be no occasion for the company to make any purchases to any considerable extent.

Much of the law that has been cited upon this question is where there has been a *fraudulent intent* in withholding the mortgage from record or withholding where it was known by the mortgagee that others *would* give extensive credit and would be misled by such withholding—which the courts have construed to be a fraudulent withholding. In this case we think that *that* law is not applicable to the facts as found by us.

In this state it is, we believe, the law that even under such state of facts, the creditors who have extended credit in the interim between the taking and filing of the mortgage can not be preferred to the mortgagee unless they have, in some way, seized the property or obtained a lien upon it, but we do not see that this question is involved under the facts in *this* case.

It is contended by counsel for plaintiff that the withholding from record, although not with the intent at the time the mortgage is given of extending the credit of the mortgagor, yet, if while the mortgage is being withheld, the mortgagee becomes aware of the fact that the mortgagor is having extended to him credit and he still does not file his mortgage, that will work an estoppel upon him on the ground that he has not acted when he was called upon to act and hence can not assert his rights as against one who has been misled by his not acting.

A consideration of the cases in this state, is found in 112 Fed. Rep., 301, *In Re Shirley*. In that case, Judge Day has reviewed carefully many of the decisions of the state of Ohio, and we think his conclusions are well founded, and it will not be necessary for us here to consider them any further than they are considered in that case. Judge Day says that there can be no estoppel in the absence of fraud and in the case he was then considering, he had found that there was no actual fraud, although the mortgage had been withheld by reason of an agreement between the mortgagor and the mortgagee that it should be withheld from the record. And Judge Day says this proposition is true: That there can be no estoppel in the absence of fraud if the mortgagee simply held his security void until filed, as against creditors who were at full liberty to assert their rights against

the property. The mortgagor had an undoubted right to prefer creditors by giving to one a security denied to others. When the chattel mortgage is filed, it becomes such preference only from the date of filing; until filed, it is void as to creditors. While this term is used without limitation in the statute, as construed by the Ohio Supreme Court it means such creditors as have fastened upon the property *before* the filing of the mortgage. All other creditors must assail the security for fraud in order to defeat the preferences. And he says that the cases holding a contrary doctrine are from states with different statutes, or where the Supreme Court has given a different construction to a similar statute.

It is contended by counsel for plaintiff that, outside of the statute and the construction given to it by the Supreme Court, the doctrine of estoppel obtains in these cases; that the decisions of Ohio on the construction of the statute are not adverse to holding that a mortgage withheld from record as this was, will estop the party from asserting it as against those who became creditors of the mortgagor while the mortgage was thus withheld. Many cases are cited to us in which it is claimed that this doctrine is held.

We are cited to *Dobson* v. *Snyder,* 70 Fed. Rep., 10. In that case the court found a design and intent on the part of the bank for whose benefit the mortgage was given and the mortgagor to shield and benefit the latter at the expense of some one else. That case is not applicable to the facts we find in this.

In California, as found in *Ruggles* v. *Cannedy,* 53 Pac. Rep., 911, the court construes the statute pertaining to mortgages in connection with the statute in regard to sales and places the matter of record of mortgage on the same ground and makes it a substitute for the delivery of the goods in a sale, and construes their statute to mean that unless the mortgage is recorded, it is absolutely void as to all creditors.

A number of cases have been cited from Missouri, and that state seems to hold that unless the mortgage is left for record as contemplated by the statute it is void as to any one who has been misled, to his injury.

In 123 Mo., 141, it is held that such a mortgage, as a matter of law, is void as to creditors, where the mortgage was withheld for the purpose of not impairing the mortgagor's credit.

Cases cited from Michigan show that a mere withholding of the mortgage from record will work an estoppel against the mortgagee under the statute of that state as to chattel mortgages, although such withholding is done without any fraudulent intent.

In 137 Ind., 175, the court found the conveyance fraudulent in its inception, and that the withholding was one step in carrying out the fraud, and the coneyance was held fraudulent.

In Iowa the courts hold that the withholding must be with a fraudulent intent in order to give subsequent creditors preference over the mortgagee.

The courts of South Dakota hold the same as Michigan and so does the 20th Fed. Rep.  And the same doctrine is held in the 29th Fed. Rep., 566.  In 12 Wash., 190, the holding is in the same line as in the states of Michigan and South Dakota; and Arkansas holds also the same.

In 73 Wis., 354, it is held that the withholding by agreement with the mortgagor makes it fraudulent as to intervening creditors, and cites 67 Wis., 101, as holding the same doctrine.

In 92 Ala., 443, the holding is, that a mortgage purposely withheld from the record lest it might injure the mortgagor's business and credit is fraudulent as to intervening creditors and to any one who gives up a security prior to the mortgage.

In 17 B. Mon., 779, it is held that if it is withheld by an arrangement or agreement, it can not prevail over a trustee for creditors.

The case cited from 50 Neb., 54, is one where the mortgage was held by agreement, with fraudulent purpose, of both parties to the mortgage, and it was held in that case that it was fraudulent as against creditors.

In 53 N. J. Eq., 350, the court of that state construes the chattel mortgage act to make a mortgage, not left for record, inferior to all creditors whether before or after the mortgage and whether they be judgment creditors or not.

We do not find that any of these courts intended to make a holding on the doctrine of estoppel entirely independent of a construction of the statute of chattel mortgages in the state; although, in some of them, the statute is not mentioned by the court in connection with what it says on the ground of estoppel, yet the court, we believe, intends to say in all of them, that the chattel mortgage act is such that if the mortgagee withholds the mortgage either by agreement or by neglect to record it for any other reason, the statute can not protect the instrument, and the doctrine of estoppel will arise. But the courts of Ohio have not so construed our statute; and I need not cite the decisions in this state, as they are referred to in Judge Day's opinion in *Re Shirley, supra.*

These mortgages were upon goods, among other things, where the mortgagee was left in possession and left free to transact business with the goods the same as though the mortgages were not given. Hence, under the authority in this state (*Francisco v. Ryan*, 54 O. S., 370), as to that class of goods, the mortgage would have been of no effect even if filed against creditors who obtained liens upon the property, and the property mortgaged being largely of this nature, there was nothing to be gained in filing the mortgages. They would have accomplished but one purpose and that would be to make all creditors proceed at once to collect their claims from the company.

It is held in the last case cited, that a mortgage of this nature constitutes a valid contract for a lien on such after acquired property, and possession thereof lawfully taken by the mortgagee has the same effect of protecting it in his hands from the claim of the mortgagor's creditors as has possession taken of the property owned by the mortgagor at the time of the execution of the mortgage.

It is the holding of the court that the mortgages in question are prior in right as to the property acquired by them to that of the creditors, whether their claims arose prior to the mortgage or after the same was given. A decree may be drawn accordingly.